No. 34,917

THE CITY OF NORTH NEWTON, *Plaintiff*, v. J. E. REGIER, as Mayor of North Newton, and the CITY OF NEWTON, *Defendants*.

(103 P. 2d 873)

Opinion filed July 6, 1940.

*Vernon A. Stroberg*, of Newton, for the plaintiff.

*J. Sidney Nye* and *Fred Ice*, both of Newton, for the defendants.

The opinion of the court was delivered by

THIELE, J.: This is an original proceeding in mandamus brought by the city of North Newton to compel its mayor and the city of Newton to execute a contract for the disposal of sewage. We shall hereafter refer to the two cities simply as North Newton and Newton. The matter is submitted to us by motion for judgment on the pleadings.

The motion for the writ discloses that North Newton is a city of the third class having a population of approximately five hundred persons, that defendant, J. E. Regier, is its duly elected and acting mayor, and that its south city limits are about one-half mile north of the north city limits of Newton, a second-class city having a population of approximately eleven thousand people, and having a sewer system with a disposal plant emptying into Sand creek, a stream which flows in a southwesterly direction from North Newton through Newton and its park system, and that the disposal plant of Newton has sufficient capacity to handle the sewage of both cities; that North Newton, which prior to September, 1939, had no sewer system, passed an ordinance providing for the installation of such a system; that the disposition of sewage other than through the

sewage system of Newton would necessarily result in drainage thereof into Sand creek and thence through the park system of Newton, and the two cities deemed it desirable to enter into a contract for the disposition of the sewage from North Newton through the sewer system of Newton, and that competent engineers were employed, made a survey and report, and based thereon a contract was prepared setting forth the conditions under which joint operation should be had, a copy of the contract being attached to the motion. It was further stated that on May 4, 1940, at a regular meeting of the governing body of North Newton a resolution was adopted directing the proper officers of the city to execute the contract, and that similar proceedings were had by the governing body of Newton, whose mayor and city clerk had executed the contract; that the mayor of North Newton had refused to execute the contract, claiming it was illegal and void for three reasons: (1) that the two cities were without power and authority to enter into a contract for a joint sewer system, (2) that the fifteen-year term was illegal and (3) that the contract did not contain the proper basis upon which to determine the costs and charges made. It was further stated that if the contract is not entered into, it will be necessary for North Newton to build its own disposal plant, the affluent of which will be discharged in Sand creek and that the division of sanitation of the state board of health had recommended that if possible the sewage of North Newton be carried through the sewers of Newton for disposal; that the present condition of North Newton is unsanitary and that it is necessary to construct the sewer system as quickly as possible to preserve public health in North Newton. Other allegations need not be noted. The prayer is that the mayor of North Newton be commanded to execute the contract, and upon its execution the city of Newton be directed to carry out its terms and conditions.

The contract in question is long and recites the factual situation of the two cities involved and that they deemed themselves to have sufficient authority to contract and caused an engineering survey and report to be made in order to determine a basis to fix costs and charges; that in order for North Newton to connect its sewers with the sewer system of Newton, North Newton must expend considerable sums and the contract should therefore be for a period of fifteen years. The contract further sets out the details with respect to fixing a minimum annual charge of $445 to be paid by North

Newton, for modification of the charges, based on increase of flowage, etc. North Newton agrees to adopt proper regulations to prevent rainwaters, etc., from entering its sewer system, and to enforce such regulations. There is also provision for sharing expense if the sewer system of Newton becomes inadequate by reason of growth of population, provision for connections by nonresidents of North Newton, etc. And finally, there is provision for discontinuance of the service by Newton if North Newton does not make its annual payments.

The city of Newton answered that it was ready and willing to carry out the contract upon the execution thereof by the mayor of North Newton.

The defendant, J. E. Regier, mayor of North Newton, filed his motion for judgment. The motion admits the facts stated in the motion for the writ, but denies that plaintiff is entitled to the writ for the same reasons, as were set forth in the writ, why he refused to execute the contract. These reasons will be considered in order.

The first may be restated thus: Do a city of the third class and a city of the second class have power and authority to enter into a contract for a joint sewer system? The present proceeding does not question in any manner the right of either city to construct and maintain a sewerage system so long as the system serves only one city and we shall not review any statutes except those which touch upon the power of the two cities to coöperate in the disposal of sewage. Although North Newton is a city of the third class, and Newton is a city of the second class, for our purposes here, both are under the same statutes. It is provided by G. S. 1935, 12-621, that any city having a population of less than 80,000 may, in connection with its system of sewers, provide for disposal works for purification of sewage, the cost of which may be paid by the city as a whole out of the general revenue fund, and under G. S. 1935, 12-622, any such city may construct and maintain sewers and drains from the corporate limits to a connection with any creek, ravine or river within five miles thereof or may build, maintain and operate disposal works for the purification of sewage at any point along or near the line of such sewer or drain. Under G. S. 1935, 12-630, cities of less than 50,000 are authorized to levy a tax for the purpose of maintaining and operating sewage-disposal plants. Under the above statutes, there is no definition of what a sewage-disposal plant must consist, further than that it is for purification purposes.

It is evident that the legislative purpose was to provide means whereby the sewage collected by the system should not be permitted to create a menace to the public health and safety—or, put another way, to authorize a city to provide ways and means whereby it would not create a nuisance, either public or private. Insofar as the matter before us is concerned, the above statutes are peculiarly applicable to North Newton, which must provide for disposal of the sewage to be collected by its newly constructed system.

Under G. S. 1935, 12-821, any city operating a waterworks, fuel, power, lighting or sewer system may extend its lines and mains within or without the city when applications have been made by persons along the proposed extension that will produce a revenue sufficient to pay interest on the cost of the extension and the operating cost of the product or service furnished. Under the legislative mandate prescribing rules for the construction of statutes, the word "person" may be extended to bodies politic and corporate (G. S. 1935, 77-201, *Thirteenth*) and cities were held to be within that term in *Delaney v. City of Salina,* 34 Kan. 532, 540, 9 Pac. 271, and *State, ex rel., v. Comm'rs of Atchison Co.,* 44 Kan. 186, 188, 24 Pac. 87. In the recent case of *Kansas Gas & Elec. Co. v. City of Mc-Pherson,* 146 Kan. 614, where the question was the right of one city to extend its electric transmission lines to another city and to furnish current, the statute we are considering and others were involved. Although electric lines were there involved, the authorization to extend lines and furnish service was partly under the statute we are now considering, and in considering who could be served, it was said:

"Neither do they have any limitation with respect to the class of consumers, whether individuals, partnerships or public or private corporations, who may be served." (p. 622.)

Whatever may be the power of North Newton to contract, certainly Newton could make the contract for extending service to a customer outside the city limits. In determining the matter, we notice also the power of a city to enact ordinances for the preservation of the health of the inhabitants of the city and to make such rules and regulations as may be necessary to carry such power into effect. Newton has such power under G. S. 1935, 14-401, and North Newton has it under G. S. 1935, 15-401, and under G. S. 1935, 12-101, *Fourth,* every city has power to make contracts in relation to the concerns of the city necessary to the exercise of its corporate or administrative powers.

We do not deem it necessary to discuss further the question of extent of power. We are of opinion that it was not obligatory upon North Newton that it either dump its sewage in Sand creek, at the risk of creating a public nuisance which would be a menace to health, or build a particular type of sewage-disposal plant, but that it did have an obligation to so act that the sewage would be properly taken care of and disposed of. Without regard to the matters hereafter mentioned, we hold that both cities had power to make the contract whereby the sewage of North Newton would be disposed of through the sewers of Newton.

The next contention is that the fifteen-year term makes the contract illegal. It may be observed the reason assigned in the contract for that term is that North Newton will incur considerable expense in extending a main to the Newton point of reception, and the term of fifteen years is necessary. The business advisability is apparent. Had North Newton built a disposal plant, there is no doubt it could have levied a tax indefinitely to maintain and operate it (G. S. 1935, 12-630). The statute authorizing Newton to extend its service does not place any limitation of time on contracts to be made under it (G. S. 1935, 12-821). We are not overlooking Laws 1929, ch. 123, appearing as G. S. 1935, 13-1018f to 13-1018k, pertaining to cities of the first class having a population over 95,000, authorizing contracts of the nature of the one now before us, fixing standards for determining charges, and providing that the compensation shall in no case be fixed for a period to exceed five years. The fact the legislature saw fit to fix the term with reference to cities of one class does not necessarily mean that other cities are so restricted or do not have power to make contracts for longer periods. The contract in question preserves to North Newton the right to use the connection for at least fifteen years, but the charge to be paid is dependent on factors which may or may not be, but are not necessarily, constant. Some contention is also made that the cities have no power to contract beyond the terms of their officers. This contract is made by the two governing bodies in the exercise of their administrative powers and duties. Under such circumstances, it may make a contract for a term of years. (See quotation from 28 Cyc. 654, in *Hall v. City of Wichita,* 115 Kan. 656, 658, 223 Pac. 1109, and other citations therein.) A contract of the kind under consideration must have a term sufficient to warrant the expense involved. Much must be left to the judgment and discretion of

the officials in performing their public duties. A court may not interfere unless it clearly appears that the term fixed is unreasonably long or that the officials abused their discretion. We can arrive at no such conclusion here. The contract may not be stricken down because of the fifteen-year term for its operation.

And, finally, it is contended by defendant that the charges provided are not proper, and the engineers employed did not use the proper basis in determining those charges. It may be observed the governing bodies employed the engineers to get technical advice, and they evidently were satisfied it was good advice, at least so far as they relied upon it. It appears that in fixing the minimum charge, consideration was given to the daily sewage flow, the cost of the disposal plant in Newton, the population ratio between the two cities, etc. While not exactly the same, the method and measure followed was similar to that prescribed for cities over 95,000 as provided in G. S. 1935, 13-1018j. Some complaint is made that the proportionate property valuations were not included, but there is nothing in the record which would lead to a conclusion that had these valuations been a factor, the result would have been changed. Insofar as G. S. 1935, 12-821, to which reference has been made, is concerned, Newton could make the agreement on the basis it would,

"Produce revenue in the judgment of the governing body, sufficient to pay interest on the cost of the extension, and the operating cost of the . . . service furnished."

So far as North Newton was concerned, certainly the governing body of that city gave consideration to the question whether the charges agreed on were less than the expense of building a separate disposal plant, paying interest on the investment and maintaining and operating it. The record presents no evidence on any of these matters. In the absence of some statutory declaration as to elements which must be considered, the judgment and discretion of the governing bodies must prevail. We are asked simply to say that some method should be followed other than the one which was followed—in other words, to substitute our judgment for the judgment of the governing bodies of Newton and North Newton.

We conclude that the refusal of the defendant, J. E. Regier, as mayor of North Newton, to execute the contract, for the reasons asserted in his motion for judgment, is not justified, and that the writ of mandamus asked for should be allowed. It is so ordered.