No. 30,434.

GEORGE D. FISK, *Appellant*, v. THE BOARD OF MANAGERS OF THE KANSAS SOLDIERS' HOME et al., *Appellees*.

No. 30,478.

GEORGE D. FISK, *Plaintiff*, v. THE BOARD OF MANAGERS OF THE KANSAS SOLDIERS' HOME et al., *Defendants*.

(5 P. 2d 799.)

Opinion filed December 12, 1931.

*John W. Davis, Russell L. Hazzard,* both of Dodge City, and *Harry E. Crosswhite,* of Greensburg, for the appellant and plaintiff.

*Roland Boynton,* attorney-general, *Walter T. Griffin,* assistant attorney-general, and *Arthur J. Mellott,* of Kansas City, for the appellees and defendants; *Lane Dutton,* of Dodge City, of counsel.

The opinion of the court was delivered by

SLOAN, J.: This is an original proceeding in mandamus to compel the board of managers of the Kansas Soldiers' Home at Dodge City to approve and deliver to plaintiff proper vouchers for milk sold and delivered by the plaintiff to the commissary department of the home. There is also an appeal from the district court of Ford county from an order sustaining a demurrer to the petition.

The defendants moved to quash the alternative writ. This presents the same question that was considered by the district court when it sustained the demurrer, and for convenience the cases have been consolidated and will be considered together.

It is alleged in each of the petitions that the board of managers of the Kansas Soldiers'. Home and the plaintiff entered into a written contract on January 1, 1928, whereby the board leased to the plaintiff the real estate belonging to the home, consisting of the farm and pasture lands, two cottages, and the barns and corrals situated on the Fort Dodge military reservation, for the term of five years from the date of the lease; that the plaintiff entered into the possession of the premises and has performed all of the conditions of the contract, and that the defendant has refused to audit plaintiff's claims arising under and by virtue of the contract. The contract is as follows:

"This lease, made this 1st day of January, 1928, by and between the board of managers of the Kansas State Soldiers' Home, party of the first part, to George D. Fisk, of Fort Dodge, Kan., party of the second part;

"Witnesseth, that said party of the first part, in consideration of the rents, covenants and agreements of the said party of the second part, hereinafter set forth, does by these presents, let, lease and rent to the said party of the second part the following-described real estate, to wit: All the farm and pasture lands in Fort Dodge military reservation and two cottages in the Kansas' State Soldiers' Home; also all the barns and corrals situated on the Fort Dodge military reservation; it being understood and agreed that party of the first part is to supply the necessary steam, water and electric lights for the cottages and barns; and are further to furnish to party of the second part, for himself, family and necessary employees, maintenance (consisting of the necessary commissary supplies).

. "To have and to hold the same for a term of five years, unto the said party of the second part, from the 1st day of January, 1928, to the 31st day of December, 1933.

"And said party of the second part, in consideration of the leasing the premises above, and the covenants and agreements of the party of the first part; covenants and agrees with the said party of the first part and their suc-

cessors, to pay as rent for the same the sum of one thousand nine hundred and sixty dollars ($1,960) per year, payable in monthly installments of one hundred and sixty-three and 34/100 dollars.

"Party of the second part further agrees and covenants to supply and furnish the Kansas State Soldiers' Home at Fort Dodge, Kan., with seventy-five gallons of milk per day, or as much additional as they may require; at the agreed price of forty cents per gallon; all milk furnished to measure up to the legal requirements of 3.3 per cent butter fat; milk for cottages to be bottled, having been properly cooled and aërated before being bottled; party of the second part to furnish bottles in first instance; cooler and aëration apparatus; party of the first part to furnish suitable building for cooling and bottling the milk; it is further agreed that party of the second part is to have the exclusive right to sell milk at Kansas State Soldiers' Home at Fort Dodge, Kan., during the term of this lease.

"Party of the second part further agrees to cart away and dispose of all garbage that accumulates at the Kansas State Soldiers' Home; said garbage to be hauled away each day of the week, excepting Sundays, during the term of this lease.

"Party of the second part further agrees not to keep or maintain to exceed forty head of stock on pasture lands in said military reservation, and he further agrees to provide suitable space in barns for party of the first part, that they may keep not to exceed five head of horses, and will reserve necessary feed and hay room for same.

"It is further agreed by and between the parties that party of the first part shall have and may preserve twenty acres of the farming land with such military reservation, for the purpose of gardening; said twenty acres to be designated and selected by party of the first part; party of the second part further agrees to purchase seed and sow acres of said land, suitable for said purpose, in alfalfa, and to keep the same disked and cultivated; and further agrees to keep all tillable land cultivated and tilled in workmanlike manner; to keep all barns and fences in good condition of repair during the term of this lease, natural wear and tear and damages by elements excepted.

"Party of the second part further agrees to enter a bond in the sum of one thousand dollars, in favor of the state of Kansas, and the board of managers of the Kansas State Soldiers' Home of Fort Dodge, Kan., for the faithful performance of this contract.

"Witness our hands this 2d day of January, 1928.

"BOARD OF MANAGERS OF THE KANSAS
STATE SOLDIERS' HOME,
"By E. C. HOLSTEIN, *President.*

"GEORGE D. FISK, *Lessee.*          MINNIE M. MICKEL, *Secretary.*"

The defendants contend that the contract was void because it covers a term exceeding the power of the board. We are first concerned with the power which the legislature has seen fit to vest in the board of managers. The secretary of interior was authorized by an act of congress, approved March 2, 1889, to convey the Fort

Dodge military reservation, as described in the act, to the state of Kansas on condition that the state of Kansas, within twelve months from the date of the act, cause to be paid the purchase price "and shall within three years establish and provide for the maintenance thereon a home in which provision shall be made for the care and maintenance of officers, soldiers, sailors, and marines, who have served in the army, navy, or marine corps of the United States, their dependent parents, widows, or orphans, and under such rules and regulations as said state may provide." (25 U. S. Stat., ch. 420.) The legislature of Kansas was in session while the bill was pending in congress, and anticipating the passage of the bill it enacted chapter 235 of the Laws of 1889, in which it made the necessary appropriation for the payment of the purchase price, and provided that there should be established on such military reservation an institution under the name and style of "the Kansas Soldiers' Home." The general supervision of the home was vested in a board of managers, consisting of three members appointed by the governor, by and with the advice of the senate. The first appointments were made for terms of one, two and three years, and thereafter it was provided a member be appointed each year for a term of three years. The board is required to meet on the first Wednesday of May of each year and organize by electing from their number a president and secretary.

The board of managers was vested with "full control of said institution, the property, effects, and management thereof," (R. S. 76-1904) with full authority to appoint and fix the salaries of officers and remove such officers when they deemed it for the best interest of the institution. They were also given power to set up a system of government for the home, and make such rules and regulations as may be necessary for its successful administration. The powers vested in the board by the original act have not been abrogated or abridged by subsequent legislation. It clearly appears from the statute that the legislature, in accepting the military reservation from the federal government, set about to comply with the condition imposed and to accomplish this end created the board of managers, vesting it with broad and general power to be exercised in establishing and maintaining a suitable and comfortable home for indigent soldiers, sailors and marines who served in the army, navy or marine corps of the United States, and such members of their families as are dependent on them for support.

With these general powers in mind let us consider the contract. We glean from the contract that its purpose was to secure for those who are in the home pure, wholesome milk. The contract as a whole points to this purpose. The leasing of the land, sowing of alfalfa, the use of two cottages, barns and corrals, together with the furnishing of electricity, water and steam, cooler and aërating apparatus, reflect the purpose of the board of managers to obtain a milk supply adequate for the inmates of the home. Does the fact that the contract extends beyond the term of the members of the board invalidate it?

The defendants call our attention to and cite as authority, *National Bank v. Peck*, 43 Kan. 643, 23 Pac. 1077; *Sheldon v. Comm'rs of Butler Co.*, 48 Kan. 356, 29 Pac. 759; *Comm'rs of Coffey Co. v. Smith*, 50 Kan. 350, 32 Pac. 30; *State, ex rel., v. Wyandotte County Comm'rs*, 131 Kan. 747, 293 Pac. 525, holding that a board of county commissioners cannot enter into a contract which binds its successor. An examination of these cases discloses that in each instance the court was dealing with a particular statute, administrative in character, and that no necessity existed for a contract longer than the life of the board, and that in each instance the board was attempting to tie the hands of their successors.

In 46 C. J. 1032 it is said:

". . . ordinarily the power is limited in time to the term of the officer who makes it, but if the extent of the officer's power is not expressly limited, the facts and circumstances of each case must be considered in determining it."

In *Manley v. Scott*, 108 Minn. 142, 29 L. R. A., n. s., 652, 657, the court discussed the Kansas cases cited to which we have just referred, and then said:

"These cases all rest upon the ground either that the particular contract under consideration was beyond the power of any board to make, or that it extended beyond the time when the particular board would go out of existence, and was against public policy because it deprived the succeeding board of the power to perform the duties which were imposed upon it by law."

This principle of law is discussed in 7 R. C. L. 945, as follows:

"There is a decided conflict in the authorities on the question as to the validity of those contracts of an expiring board of commissioners which extend into and are intended to operate beyond their term of office, and into the term of the board succeeding. Some of the cases hold that such contracts are invalid, the objection being that, in the absence of an affirmative showing as to some necessity or special circumstances showing that the public good is subserved, such contracts are prejudicial to the public interests and against public policy, and that they are, therefore, void. But it is clear that if a

board of county commissioners has express power to make a particular contract at any time during its term of office, a contract made by such board, in accordance with the law, a short time before the expiration of its term of office is not contrary to public policy, and, in the absence of fraud, is valid and binding upon an incoming board of commissioners, although it extends far into their term of office. The ground upon which this rule is based is that a board of county commissioners is a continuously existing corporation, and, consequently, while the personnel of its membership changes, the corporation continues unchanged. Its contracts being the contracts of the board and not of its members, it follows that those contracts extending beyond the term of service of its then members are not invalid for that reason. It has been said that to hold contracts invalid because part or all of a board cease to exercise public functions would be to put these corporations at an enormous disadvantage in making the contracts which are essential to the safe, prudent, and economical management of the affairs of a county."

Where general power is given to an administrative board to manage and control property it has the power to make a contract concerning such property extending beyond the term of the members thereof, if such contract is reasonable and not contrary to public policy. This rule of law is recognized in all transactions with the board of managers involving a contract extending beyond the term of the members of the board, and its validity must of necessity depend upon the nature of the contract and the end to be accomplished. If the contract is reasonable, prudent and economically sound it is not contrary to public policy. Every one would concede, for instance, that an outgoing board of managers might lease the pasture land for the ensuing summer although their term ceased on the first Wednesday in May, and every one would likewise concede that a lease of the pasture lands, together with the agricultural land, for a decade would ordinarily be wholly beyond their powers. This would be especially true if the apparent purpose of the board of managers in making a long contract was to deprive their successors in office of the exercise of the powers granted them by the statute.

It is common knowledge that the development of a herd of cows producing seventy-five gallons of milk a day, testing three and three-tenths per cent butter fat, cannot be accomplished without the expenditure of time and a large sum of money, and to properly prepare such milk for the use of those who are in the home, adequate coolers and aërating apparatus must be provided; that milk is the first and basic food of mankind and is essential to insure the health and happiness of the inmates of the institution.

It is presumed that the board of managers exercised its power

honestly, in good faith and upon proper information. (*Board of Education v. Shepherd*, 90 Kan. 628, 135 Pac. 605.) The facts and circumstances revealed in the contract and pleadings are such that we cannot say the term of the contract is unreasonable or prejudicial to public interest.

It is urged by the defendants that the contract is void for the reason that the lease was not let to the highest and best bidder as provided by R. S. 76-1911. The board of managers had authority to use the land in establishing and maintaining the Kansas Soldiers' Home. If, however, any part of the land was not required for the use of the home and inmates "the board may lease to the highest and best bidder any portion of the land not required for cultivation." (R. S. 76-1911.) The contract is not divisible. All of its provisions must be considered together, and, as we have already seen, the purpose of the contract was not the leasing of the land but the use of the land to procure proper food for the inmates of the home. This was a proper use of the land, and the contract does not come within the purview of the statute requiring that it be let to the highest and best bidder.

Other questions are suggested by the defendants, but, in view of the conclusion we have reached, we do not think it necessary that they be discussed or decided.

The order of the district court sustaining the demurrer is reversed, and the motion in the original action in this court is denied.

SMITH, J., not sitting.